UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MARY DELORES BADILLO,

        Plaintiff,

    v.

NANCY BERRYHILL,
Acting Commissioner of Social Security,

        Defendant.

Case No. 16-cv-06823-JCS

**ORDER REGARDING CROSS MOTIONS FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 14, 17

## I.    INTRODUCTION

Plaintiff Mary Badillo brings this action appealing the final decision of Defendant Nancy Berryhill, Acting Commissioner of Social Security (the "Commissioner"), denying Badillo's application for disability benefits. The parties have filed cross motions for summary judgment pursuant to Civil Local Rule 16-5. For the reasons discussed below, Badillos's motion is GRANTED, the Commissioner's motion is DENIED, and the matter is REMANDED for an award of benefits.[1]

## II.    BACKGROUND

### A.    Badillo's Medical Records

Badillo is a fifty-year-old woman with a long history of mental and physical health impairments including bipolar disorder, mood disorder, generalized anxiety disorder, polysubstance abuse in remission, gastroparesis with episodic nausea and vomiting, and chronic low back pain. AR (dkt. 13) at 23. She reports a difficult childhood marked by sexual, physical, and emotional abuse, and at least one suicide attempt at age fifteen. *Id.* at 588–89. According to

---

[1] The parties have consented to the jurisdiction of the undersigned magistrate judge for all purposes pursuant to 28 U.S.C. § 636(c).

Badillo's friend and roommate, Marcelino Enriquez, Badillo started experiencing extreme anxiety and panic attacks in the year 2000. *Id.* at 306–07. In April 2007, Badillo began receiving psychiatric treatment from Dr. Hiawatha Harris, M.D. at Pathways to Wellness. *Id.* at 1347–52. Dr. Harris diagnosed Badillo with bipolar disorder and began seeing her on a monthly or bimonthly basis. *Id.* at 383–96, 424–34, 563–67, 1315–53, 1888–1916. Notes from each visit show some improvement and stabilization from medication and therapy, but Badillo's symptoms continue to fluctuate, particularly in response to external stressors. *Id.*

Several doctors have provided opinions documenting Badillo's functional limitations resulting from her psychiatric impairments. Dr. Harris provided four opinions—in 2012 (*id.* at 474), January 2014 (*id.* at 563–66), August 2014 (*id.* at 567), and 2015 (*id.* at 1714–22). All of Dr. Harris' opinions express that Badillo's psychiatric symptoms would create functional limitations such that she would not be able to work on a consistent basis. In October 2014, Dr. Ahmed El Sokkary, Ph.D., conducted a consultative examination, including psychological testing, at the request of Social Security. *Id.* at 450–54. His opinion noted that Badillo "demonstrated a capacity to understand, remember, and perform simple to moderately difficult tasks," and that she "was able to maintain a sufficient level of concentration, persistence, and pace to do basic to moderately complex work." *Id.* at 453. However, Dr. El Sokkary also noted that Badillo "would have difficulty keeping a regular workday/workweek schedule without interruptions from psychiatric symptoms." *Id.* Finally, Dr. Michael Lace, M.D. reviewed Badillo's medical records in December 2014 and found that she would have mild to moderate restrictions for carrying out work activities such as understanding, remembering, and executing instructions and making judgments on work-related decisions. *Id.* at 1703. Dr. Lace found that Drs. Harris and El Sokkary's opinions that Badillo's "condition is severe and precludes working" are supported by "little evidence from the treatment records." *Id.*

Badillo has also presented with physical limitations. Her primary physical limitation is gastroparesis, a condition that prevents stomach muscles from functioning properly, causes the stomach to empty at an abnormally slow rate, and causes abdominal pain, nausea, incontinence, constipation, diarrhea, and vomiting. *Id.* at 488–501, 548, 679–82, 821–22, 904–06, 938-40,

1187–96, 1361–75.  Badillo's medical records first document gastroparesis in 2008 and she has been to the hospital several times due to her symptoms.  *Id*.  Furthermore, Badillo had a cancerous colon polyp removed in late 2008; there are no recurrences in the record.  *Id*. at 1699.  Finally, Badillo suffers from chronic lower back pain.  *Id*. at 1699.  Her primary care physician, Dr. Laura Miller, M.D., completed a questionnaire in December 2013, opining that Badillo would miss work at least twice per month due to her physical limitations.  *Id*. at 560–62.  After reviewing Badillo's record in late 2014, Dr. Lynne Jahnke, M.D. agreed that Badillo could miss work due to her abdominal issues, but she opined that Badillo has few physical restrictions regarding workplace activities.[2]  *Id*. at 1697.  Dr. Jahnke also opined that Badillo's primary limitations were due to her psychiatric impairments.  *Id*. at 1697.

### B.  Administrative Hearings

#### 1.  Initial Hearing

Administrative Law Judge Philip Callis (the "ALJ") held a hearing on October 15, 2014. AR at 40.  In response to the ALJ's questions, Badillo confirmed that she is forty-six years old, she attended high school through the second half of tenth grade, and she can read and write simple English.  *Id*. at 42–43.  The ALJ determined that all of Badillo's past work experience was before the relevant time period.  *Id*. at 43.  Badillo testified that she lives with her friend who also serves as a caretaker, that she wakes up around noon, and that she spends most of the day in her room. *Id*. at 44, 48–49.  She can prepare simple foods on her own, but needs someone available when she bathes in case she falls because her medicine makes her dizzy.  *Id*.  Badillo then testified that she has been receiving psychiatric care at Pathway to Wellness with Dr. Harris.  *Id*. at 46.  The ALJ asked which psychiatric medications she is taking, to which Badillo replied that she takes Seroquel, lithium, Geodon, and Xanax.  *Id*.  She also takes Temazapam in the summer because she becomes more depressed during that time of year.  *Id*.

The ALJ then asked what Badillo does alone in the house when her roommate is at work.

---

[2] For example, Dr. Jahnke opined that Badillo would have no restrictions standing or walking, could frequently lift and carry up to 10 pounds, could occasionally lift and carry up to 20 pounds, and had no restrictions on the use of hands or feet.  AR at 1692–94.

*Id*. at 47.  Badillo testified that she sleeps most of the day (eighteen to twenty-two hours) because of her medicine.  *Id*. at 48.  She leaves the television on in the background and does not use her computer.  *Id*. at 47–48.  Sometimes, she finds activities to keep her fingers busy such as untangling necklaces.  *Id*. at 47.  The ALJ then asked whether Badillo goes shopping, to which she responded that she sometimes goes with her roommate when he cannot find the specific item she wants.  *Id*. at 49.

Next, the ALJ asked Badillo questions about family activities.  Badillo responded that she only attends "very special" family activities, such as her aunt's eightieth birthday, and that she had to take "a lot of Xanax to get there."  *Id*. at 50.  Badillo then testified that her three daughters come to visit her once or twice a month.  *Id*. at 50–51.  When they visit, Badillo spends at most ten minutes with them and the rest of the time she is in her room.  *Id*.  Badillo also testified that she went to Texas for the end of her father's life.  *Id*. at 51–52.  She explained that in order to keep herself alert and focused while in transit she took a capsule that her friend gave to her.  *Id*.  Badillo testified that she informed her doctor about the capsule but she did not remember the name of the substance inside.  *Id*.  Badillo also testified that she is a recovering cocaine addict but has not taken it since her trip to Texas.  *Id*. at 51.  The ALJ asked if Badillo used marijuana, to which Badillo responded that she had used it once or twice last year because she was not eating due to her cancer, but that her doctor did not want to prescribe it to her.  *Id*. at 53.

The ALJ then asked Badillo about her gastroparesis.  *Id*. at 54.  Badillo testified that it is "a form of immobility to push the fecal out."  *Id*.  She testified it takes her system ten days to digest what normally takes a few hours.  *Id*.  The ALJ asked no further questions of Badillo and turned the hearing over to Linnea Forsythe, Badillo's attorney.  *Id*. at 55.

In response to questions from Forsythe, Badillo testified that she and Dr. Harris decided it would be best to lower her dosage of medicine for one month so that she could be coherent through the hearing.  *Id*. at 55–56.  Badillo attested that the dosage she usually takes sedates her such that she cannot speak or walk around.  *Id*. at 56.  She testified that she needs help using the bathroom and wears diapers when her roommate is not around.  *Id*.  In order to leave the house, Badillo testified that she cannot leave alone and that she takes a Xanax to keep calm.  *Id*. at 57–58.

Badillo described her anxiety symptoms as heart racing, scattered thoughts, crying, and eventually the inability to move. *Id*. at 58. Forsythe then asked Badillo the reason she becomes depressed in the summers. Badillo attested that she was raped by her grandfather and her mother's boyfriend from age five to age twelve, and that the summer is the most traumatic time of year because she was left home alone. *Id*.

Forsythe next asked how gastroparesis affects Badillo's eating. *Id*. at 59. Badillo testified that she eats only once per week, except that on a daily basis she eats a small butter roll and drinks lots of liquids. *Id*. Badillo also testified that she takes three different medications to treat the gastroparesis. *Id*. at 60. Next, in response to a question regarding her joint pains, Badillo explained that if she sits still for more than twenty to thirty minutes, her bones "lock up" and she needs help to stand. *Id*. She has pain throughout her body including her left hip bone, right shoulder, and neck. *Id*. at 61. Badillo testified that she takes muscle relaxers to alleviate these pains. *Id*.

After Forsythe finished with her questions, the ALJ questioned vocational expert Mr. Van Winkle ("VE Van Winkle"). *Id*. at 62–65. The ALJ first presented the hypothetical scenario of someone with Badillo's age, education, and work experience, who was able to "sustain concentration, persistence and pace for three to four . . . step routine tasks over a workday," accept supervision, interact but not collaborate with coworkers, and briefly interact with the public. *Id*. at 63. VE Van Winkle testified that such a person could work in several jobs that are relatively common nationally. *Id*. at 63–64.

The ALJ then added a series additional of limitations to the original hypothetical. *Id*. at 64–65. First, the ALJ described an individual who could not consistently work an eight hour workday or a forty hour work week. *Id*. at 64. Next, the ALJ asked whether jobs would be available for an individual who missed work two to three times per month on a regular basis. *Id*. Third, the ALJ described an individual who consistently leaves work for a day or two at a time without notice and who suffers panic attacks. *Id*. at 64–65. Finally, the ALJ asked whether there would be jobs available for an individual who cannot stay on task 25% of the time due to a lack of "concentration, persistence, and pace." *Id*. VE Van Winkle testified that there would be no jobs

available for a person with any of the additional limitations described by the ALJ. *Id*. at 64–65. Forsythe declined to question VE Van Winkle.

### 2. Supplemental Hearing

On May 6, 2015 the ALJ held a supplemental hearing at Forsythe's request in order to address additional medical evidence.[3] *Id*. at 69. Based on this evidence, Forsythe had additional questions for a vocational expert, with a Mr. Clark ("VE Clark"), rather than Van Winkle, serving in that role for the supplemental hearing. *Id*. at 70. First, the ALJ presented a hypothetical to VE Clark, describing an individual of the same age,[4] education, and work experience as Badillo, who is limited to light work, cannot climb unprotected heights, and cannot be exposed to respiratory irritants, extreme heat or cold, or vibrations. *Id*. at 71–72. In addition, the individual is limited to below average emphasis on production quotas and speeded tasks, and brief superficial and infrequent contact with supervisors, coworkers, and the public. *Id*. VE Clark testified that such a person could work in a number of jobs that are common nationally and in California.[5] *Id*. at 72–75.

Next, Forsythe presented two hypotheticals. *Id*. at 77–80. In the first scenario, Forsythe described an individual with Badillo's age, education, and work experience, who was limited to brief contact with supervisors and coworkers, could not accept instructions ten percent of the time, and could not respond appropriately to criticism from supervisors. *Id*. at 77–78. VE Clark testified that these additional restrictions would not change job availability for the hypothetical person. *Id*. at 78–79. In the next hypothetical, Forsythe described a person of Badillo's age,

---

[3] The ALJ sent requests for medical interrogatories to Dr. Jahnke and Dr. Lace. AR at 69. Forsythe submitted "some memo impairment question and office treatment records" from Badillo's treating psychiatrist, Dr. Harris. *Id*. at 69, 81.
[4] During the first hearing, Badillo testified that she was forty-six years old. AR at 42. By the second hearing, Badillo had turned forty-seven. *Id*. at 71.
[5] VE Clark listed surveillance system monitor as a possible job, but there were some issues with it. AR at 74–76. It is unclear how many of these jobs actually exist in the private sector since the particular entry refers only to government jobs. *Id*. at 75–76. Furthermore, it is unclear whether this job exists on a full-time basis or if it is part of another job with a different classification. *Id*. at 76. Regardless, VE Clark also identified jobs such as a cleaner or production line inspector as suitable for someone meeting the ALJ's hypothetical, and each of those titles accounts for hundreds of thousands of jobs in the national economy and tens of thousands in California. *Id*. at 72–74.

education, and work experience, who "cannot respond appropriately to changes in the work setting." *Id.* at 80. VE Clark testified there would be no jobs available for this person. *Id.*

### C.   Regulatory Framework for Determining Disability

The Commissioner uses a "five-step sequential evaluation process" to determine if a claimant is disabled. 20 C.F.R. § 404.1520(a)(4). At step one, the ALJ must determine if the claimant is engaged in "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(I). If so, the ALJ determines that the claimant is not disabled and the evaluation process stops. If the claimant is not engaged in substantial gainful activity, then the ALJ proceeds to step two.

At step two, the ALJ must determine if the claimant has a "severe" medically determinable impairment. An impairment is "severe" when it "significantly limits [a person's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). If the claimant does not have a "severe" impairment, then the ALJ will find that the claimant is not disabled. If the claimant has a severe impairment, the ALJ proceeds to step three.

At step three, the ALJ compares the claimant's impairment with a listing of severe impairments (the "Listing"). *See* 20 C.F.R. § 404, subpt. P, app. 1. If the claimant's impairment is included in the Listing, then the claimant is disabled. The ALJ will also find a claimant disabled if the claimant's impairment or combination of impairments equals the severity of a listed impairment. If a claimant's impairment does not equal a listed impairment, then the ALJ proceeds to step four.

At step four, the ALJ must assess the claimant's residual function capacity ("RFC"). An RFC is "the most [a person] can still do despite [the] limitations" caused by that person's impairments and related symptoms. 20 C.F.R. § 404.1545(a)(1). The ALJ then determines whether, given the claimant's RFC, the claimant would be able to perform the claimant's past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). Past relevant work is "work that [a person] has done within the past fifteen years, that was substantial gainful activity, and that lasted long enough for [the person] to learn how to do it." 20 C.F.R. § 404.11560(b)(1). If the claimant is able to perform past relevant work, then the ALJ finds that the claimant is not disabled. If the claimant is unable to perform past relevant work, then the ALJ proceeds to step five.

At step five, the burden shifts from the claimant to the Commissioner. *Johnson v. Chater*, 101 F.3d 178, 180 (9th Cir. 1997). The Commissioner has the burden to "identify specific jobs existing in substantial numbers in the national economy that the claimant can perform despite her identified limitations." *Meanel v. Apfel*, 172 F.3d 1111, 1114 (9th Cir. 1999). If the Commissioner is able to identify such work, then the claimant is not disabled. If the Commissioner is unable to do so, then the claimant is disabled. 20 C.F.R. § 404.1520(g)(1).

### D. The ALJ's Decision

In his June 11, 2015 decision, the ALJ determined that Badillo has not been disabled within the meaning of the Social Security Act since she filed her application on January 9, 2013. AR at 21. At the first two steps, the ALJ determined that Badillo had not engaged in substantial gainful activity since the date of her application, and that she "has the following severe impairments: bipolar disorder; mood disorder, not otherwise specified; anxiety disorder, not otherwise specified; rule out personality disorder, not otherwise specified and generalized anxiety disorder; history of polysubstance abuse in apparent remission; status post cancerous colonic polyp removal with no recurrence; gastroparesis with resulting episodic nausea and vomiting spells; and chronic low back pain." *Id*. at 23.

Next, the ALJ turned to the third step and determined that Badillo's impairments did not meet or equal the severity of any listed impairments, specifically considering 1.04 (disorders of the spine), 5.08 (digestive disorders), 12.04 (affective disorders), and 12.06 (anxiety related disorders). *Id*. at 23. In considering 12.04 and 12.06, the ALJ considered "paragraph B" criteria and determined that Badillo has mild restrictions in daily living activities, moderate difficulties in social functioning and concentration, and that "[a]t most, her symptoms would result in some limitations in the ability to perform complex tasks." *Id*. at 24. The ALJ also found that the evidence did not establish "paragraph C" criteria because there is no history of decompensation and no evidence that small changes would lead to decompensation. *Id*.

In assessing Badillo's residual functional capacity (RFC), the ALJ described the appropriate two-step procedure. *Id*. at 25. First, he determined whether Badillo had medically determinable impairments that could reasonably be expected to produce her symptoms; next, the

ALJ considered the credibility of any statements as to the intensity, persistence, and limiting effects of those symptoms to the extent those qualities cannot be established by medical evidence alone. *Id*. at 25. The ALJ found that Badillo's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." *Id*. Nonetheless, the ALJ doubted the credibility of "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms." *Id*.

To support that conclusion, the ALJ discussed the medical history of Badillo's physical and mental impairments, beginning with her gastrointestinal and abdominal issues. *Id*. at 25–26. The ALJ noted that, while initial testing in January 2009 "indicated gastritis and some gastric content consistent with gastroparesis, subsequent testing [upper GI series, an abdominal x-ray, and lab work] have not revealed any significant findings to account for her complaints." *Id*. The ALJ acknowledged Badillo's assertion that she did not eat a lot during the week; however, he was unable to find evidentiary support of severe weight loss or malnutrition. *Id*. He then noted that, "at one point, doctors indicated the need to rule out malingering or a factitious disorder, and she had left against medical advance [sic[6]] during [a] visit, despite alleging intractable vomiting and severe abdominal pain." *Id*. at 25–26. In concluding his discussion of Badillo's abdominal issues, the ALJ noted that Badillo's "complaints appear episodic and variable but [she] has been generally stable on her current medication regime." *Id*. at 26.

The ALJ briefly summarized the medical history of Badillo's back pain, which he says she has been managing with medication. *Id*. He discussed the lack of evidence supporting spinal abnormalities, and the fact that "doctors also felt she was feigning pain to obtain more pain medication." *Id*.

Next, the ALJ turned to Badillo's psychiatric impairments, stating that "the longitudinal treatment records are not supportive of the claimant's alleged disabling disposition." *Id*. He supported this conclusion by noting that Badillo "has been considered clinically stable," that her medication regimen has remained almost unchanged, and that psychometric testing revealed a

---

[6] This appears to have been intended as "medical advice."

high level of cognitive functioning. *Id*.

The ALJ also discussed the opinion evidence given by various medical and psychological consultants. *Id*. He assigned significant weight to most of the opinions given by state agency medical and psychological consultants regarding Badillo's physical limitations. *Id*. While the ALJ acknowledged that Badillo has managed her condition well with treatment, he found that "the claimant's physical complaints are sufficient to constitute severe impairments based on her narcotic pain medication prescriptions and her history of periodic nausea and vomiting." *Id*.

Next, the ALJ discussed the opinions of each individual doctor. *Id*. at 26–27. The ALJ placed "considerable weight" on consultative examiner Dr. El Sokkary's opinions to the extent that the ALJ determined they were consistent with the record. *Id*. However, he found that, because "the claimant's symptoms [have] stabilized with treatment, there is little evidence to indicate that she would have difficulty keeping a regular schedule without interruptions from psychological symptoms." *Id*. The ALJ also assigned "great probative weight" to the opinions of the non-examining consultants Drs. Lace and Jahnke. *Id*. at 26–27. However, the ALJ declined to place controlling weight on medical source statements by Badillo's treating physician and psychiatrist because "neither their clinical notes nor the overall evidence supports the opinions" and "the providers appear to base their opinions largely on the claimant's subjective complaints." *Id*. at 27.

The ALJ placed minimal weight on the global assessments of functioning (GAF) in the record because "they do not accurately reflect the claimant's overall functioning." *Id*. He also placed minimal weight on the third party function reports by Badillo's friends because they "are inconsistent with the objective evidence" and they are not medical opinions. *Id*. To complete the RFC, the ALJ considered Badillo's statements and testimony and determined that "with regard to the severity and functional consequences of her symptoms [it] is not fully credible." *Id*. To support this conclusion he noted several discrepancies, such as the minimal changes in her treatment despite her severe complaints, periods of noncompliance, and incorrect reporting regarding her drug use. *Id*.

Finally, the ALJ found that "there are jobs that exist in significant numbers in the national

United States District Court
Northern District of California

economy that the claimant can perform" based on VE Clark's testimony. *Id*. at 28. The ALJ explained that when he asked VE Clark whether there were jobs in the national economy for an individual with Badillo's education, work experience, age, and RFC, VE Clark listed three possible occupations. *Id*. Thus, the ALJ found that Badillo is not disabled. *Id*. at 29.

### E. The Parties' Arguments

#### 1. Badillo's Motion for Summary Judgment

Badillo argues that the ALJ erred in: (1) rejecting the opinions of treating and examining medical sources Dr. Miller, Dr. El Sokkary, and Dr. Harris; (2) rejecting nonexamining medical expert Dr. Lynne Jahnke's opinion; (3) failing to include limitations caused by Badillo's gastroparesis; (4) failing to support his assessment with substantial evidence; and (5) basing his decision on an incomplete hypothetical. *See generally* Pl's Mot. (dkt 14).

Badillo argues that the ALJ erred in rejecting, in whole or in part, the opinions of several treating and examining medical sources. *Id*. at 6. She contends that Dr. Miller, her primary care physician, opined that Badillo's physical impairments would cause her to miss work several days per month. *Id*. at 7. According to Badillo, the ALJ grouped together his reasons for dismissing Dr. Miller's physical opinion and Dr. Harris's psychiatric opinions. *Id*. Badillo understands the ALJ's rejection of Dr. Miller's opinion to be based on the ALJ's view that: (1) it is not supported by evidence or Dr. Miller's own notes; (2) it is largely based on Badillo's subjective complaints; and (3) Badillo has only required medication to treat her complaints. *Id*. Badillo argues that Dr. Miller's opinion is supported by her treatment notes, which are based on years of treatment including objective testing. *Id*. at 7–8. Badillo contends these treatment notes support the conclusions that medication did not improve her gastroparesis and that this impairment would disrupt work attendance. *Id*. at 8. Furthermore, Badillo argues that Dr. Miller's opinion was consistent with Dr. Jahnke's opinion. *Id*.

Badillo also argues that the ALJ erred by dismissing consultative psychological examiner Dr. El Sokkary's opinion. *Id*. at 8. She contends that Dr. El Sokkary opined that Badillo's psychiatric impairments would lead to difficulties maintaining regular work hours. *Id*. at 8. According to Badillo, the ALJ erroneously rejected this part of Dr. El Sokkary's opinion because

11

he claimed treatment stabilized her symptoms. *Id*. at 9. Badillo contends that due to the fluctuating nature of bipolar disorder, it is improper to highlight examples of improvement to support the conclusion that a claimant has been treated. *Id*. (citing *Garrison v. Colvin,* 759 F.3d 995, 1017 (9th Cir. 2015)). Furthermore, Badillo argues that Dr. El Sokkary's opinion is consistent with the opinions of her longtime treating psychiatrist, Dr. Harris, who has documented Badillo's fluctuating symptoms over time and opines that she would be unable to maintain a normal work schedule. *Id*.

Furthermore, Badillo contends that the ALJ's dismissal of Dr. Harris's opinions was also in error. *Id*. at 10. According to Badillo, Dr. Harris completed five mental health questionnaires over the course of eight years, which continuously diagnosed Badillo with bipolar disorder and noted symptoms that would seriously affect her ability to work. *Id*. at 10–11. Badillo explains that the ALJ did not differentiate between these five opinions, and instead rejected all of them because: (1) the opinions are not supported by the record or Dr. Harris's own notes; (2) Badillo's mental condition improved with treatment; and (3) Dr. Harris's opinion was based on Badillo's subjective complaints. *Id*. at 11. Badillo argues that Dr. Harris's clinical notes support his opinion because they show that Badillo's symptoms fluctuate over time, and it is error for the ALJ to pick moments of improvement and declare that the patient has improved. *Id*. at 11–13. Furthermore, Badillo argues that because Dr. Harris' own observations are the primary basis for his opinion, it is improper to dismiss his opinion as solely based on Badillo's subjective complaints. *Id*. at 13–14.

According to Badillo, even though the ALJ purported to assign "great weight" to nonexamining medical expert Dr. Jahnke's opinion, the ALJ rejected the portion of Dr. Jahnke's opinion that Badillo could miss work due to her gastroparesis. *Id*. at 14. Badillo contends that, although Dr. Jahnke carefully reviewed the record and explained how Badillo's symptoms would affect her ability to work, the ALJ dismissed Dr. Jahnke's opinion without providing any reason or reference to specific evidence in the record. *Id*.

Next, Badillo contends that, although the ALJ found her gastroparesis to be a severe limitation at step two, he did not include limitations from this impairment in his RFC findings as

he was required to do.  *Id*. at 15 (citing *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1228 (9th Cir. 2009) (citing 20 C.F.R. §§ 404.1523, 416.923)).  According to Badillo, the ALJ omitted these limitations because her complaints were "episodic but have been generally stable with medication."  *Id*.  Badillo argues that the ALJ cannot disregard limitations solely because they are episodic, particularly when the limitations are supported by opinions that are assigned "great weight."  *Id*. at 16.  Because the ALJ assigned "great weight" to Dr. Jahnke's opinion, and Dr. Jahnke opined that Badillo could miss work due to her symptoms, Badillo insists that this omission was in error.  *Id*.  Due to this error, as well as the ALJ's rejection of the opinions of several medical providers, Badillo argues the RFC is not based on substantial evidence and "must be set aside."  *Id*.  Furthermore, Badillo contends that because the ALJ relied on an RFC that did not adequately reflect her functional limitations, the ALJ also erred when he relied on VE testimony based on that RFC.  *Id*. at 17–18.

To remedy the above-mentioned errors, Badillo requests that the Court remand for an award of benefits.  *Id*. at 18.  She contends that an award of benefits is appropriate because the record is complete, because there is no useful purpose for further proceedings, and because the rejected opinions would compel a finding of disability.  *Id*. at 19.

### 2. The Commissioner's Cross-Motion for Summary Judgment

The Commissioner argues that the ALJ's decision should be affirmed because it was based on substantial, properly evaluated evidence.  *See generally* Comm'r's Mot. (dkt. 17).  Starting with medical opinion evidence, the Commissioner contends that Dr. Miller's opinion was contradicted by clinical evidence in the record including her own treatment notes, state agency physician opinions, and treatment notes from Lifelong Medical Care.  *Id*. at 4, 7.  The Commissioner points to several examples of clinical evidence that did not support Badillo's complaints of gastroparesis symptoms and back pain, including the fact that "clinicians suspected she was malingering to obtain pain medication."  *Id*. at 5.  According to the Commissioner, these examples of clinical evidence, as well as an absence of clinical findings supporting Dr. Miller's opinion, show that the ALJ properly concluded Dr. Miller's opinion was based on Badillo's subjective complaints.  *Id*. at 6.  In a footnote, the Commissioner cites the ALJ's reasons for

13

discounting Badillo's subjective complaints, and claims that because she did not dispute these reasons, "she has waived any argument to the contrary." *Id.* at 4 (citing *Wikoff v. Atrue*, 388 F. App'x 735, 736 (9th Cir. 2010)). The Commissioner argues that, because the ALJ properly discredited Badillo's subjective complaints, and he properly concluded that Dr. Miller's opinion was based on these discredited complaints, the ALJ properly disregarded Dr. Miller's opinion. *Id.* at 4–8. Furthermore, the Commissioner contends that Badillo cites records of her gastroparesis diagnosis to support Dr. Miller's opinion, but the opinion does not list gastroparesis as one of Badillo's diagnoses. *Id.* at 8.

Next, the Commissioner argues that the ALJ properly gave little weight to Dr. El Sokkary's opinion that Badillo's psychological symptoms would cause her to have trouble maintaining a regular work schedule because it was inconsistent with substantial evidence in the record. *Id.* at 9. The Commissioner contends that Badillo's mental health treatment records "showed that she was stable, clinicians kept her medication regimen largely unchanged, and she possessed a high level of cognitive functioning." *Id.* According to the Commissioner, Badillo's medical records show "benign" symptoms that do not fluctuate to the degree she claims, and that fluctuations corresponded to external stressors such as family problems or days without medicine. *Id.* at 10–11 & n.9. The Commissioner concludes that substantial evidence in the record undermines Dr. El Sokkary's opinion that Badillo would not be able to work, and that opinion was therefore properly disregarded. *Id.* at 11.

The Commissioner then contends that the ALJ properly rejected Dr. Harris's opinion because it was based on Badillo's subjective complaints rather than clinical evidence. *Id.* at 11– 15. According to the Commissioner, Badillo "greatly overstates what the treatment notes show about her symptoms" and that the record shows improvement over time. *Id.* at 12–13. The Commissioner argues that the ALJ is not required to heavily weigh a treating physician's opinion when that opinion is based on the claimant's discredited subjective complaints. *Id.* at 14 (citing *Gertsch v. Colvin*, 589 F. App'x 381, 381 (9th Cir. 2015)). The Commissioner reasons that, because the clinical record does not support Dr. Harris's findings of extreme limitations, these findings must have been based on Badillo's subjective complaints and can therefore be reasonably

discounted. *Id*. at 15.

Furthermore, the Commissioner argues that the ALJ did not err in his evaluation of Dr. Jahnke's opinion. *Id*. at 15–16. The Commissioner explains that Dr. Jahnke noted that Badillo "might" miss work, but that her "alleged problems were 'quite variable.'" *Id*. at 15 (citing AR at 1697). The Commissioner contends that Dr. Jahnke's note is "entirely speculative and does not set forth a specific limitation that the ALJ was obligated to address." *Id*. at 15–16. To the extent this statement is a specific limitation, the Commissioner argues that the ALJ properly dismissed it for the same reasons as he dismissed Dr. Miller's opinion. *Id*. at 16.

The Commissioner points to medical expert Dr. Lace's opinion that Dr. Harris's opinions were not strongly supported by evidence in the record. *Id*. According to the Commissioner, the ALJ reasonably assigned "great weight" to Dr. Lace's opinion, and Badillo does not dispute this evaluation. *Id*. The Commissioner argues that the ALJ is responsible for evaluating and weighing evidence, and in this case the ALJ did so properly. *Id*.

Next, the Commissioner contends that the ALJ did not err in his RFC assessment. *Id*. at 17. First, the Commissioner argues that the ALJ is not required to find functional limitations from impairments found to be severe at step two, and that the ALJ's conclusion that Badillo's symptoms were not disabling was reasonable. *Id*. Second, the Commissioner contends that a diagnosis alone is not enough to establish a functional limitation, and that Badillo was required to identify specific functional limitations rather than rely solely on the gastroparesis diagnosis. *Id*. at 18. According to the Commissioner, the fact that the ALJ did not to rely on Drs. Jahnke and Miller's medical opinions does not show error because those opinions were properly rejected. *Id*. at 19. Furthermore, the Commissioner argues that because the ALJ did not err by leaving out any credible functional limitations, the ALJ did not err in relying on VE Clark's testimony. *Id*. at 20. The Commissioner contends that VE Clark's testimony was based on a complete hypothetical, and therefore the ALJ reasonably relied on the testimony. *Id*.

Finally, the Commissioner argues that if the Court finds that the ALJ erred, remand for further proceedings, rather than an award of benefits, is the appropriate remedy. *Id*. at 20.

### 3. Badillo's Reply

In her reply brief, Badillo renews her arguments that the ALJ erred in rejecting the consistent opinions of Drs. Miller, El Sokkary, Harris, and Jahnke. Reply (dkt. 18) at 4–11. She also contends that the Commissioner provided no justification for her argument that a limitation to light work would account for Badillo's gastroparesis symptoms and allow her to work. *Id.* at 11. Further, Badillo reasserts her arguments that the RFC was not supported by substantial evidence and the ALJ erred by relying on VE testimony based on this RFC. *Id.* at 12.

## III. ANALYSIS

### A. Legal Standard

District courts have jurisdiction to review the final decisions of the Commissioner and have the power to affirm, modify, or reverse the Commissioner's decisions, with or without remanding for further hearings. 42 U.S.C. § 405(g); *see also* 42 U.S.C. § 1383(c)(3).

When asked to review the Commissioner's decision, the Court takes as conclusive any findings of the Commissioner which are free from legal error and supported by "substantial evidence." 42 U.S.C. § 405(g). Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion," and it must be based on the record as a whole. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). "'Substantial evidence' means more than a mere scintilla," *id.*, but "less than a preponderance." *Desrosiers v. Sec'y of Health & Human Servs.*, 846 F.2d 573, 576 (9th Cir. 1988) (citation omitted). Even if the Commissioner's findings are supported by substantial evidence, the decision should be set aside if proper legal standards were not applied when weighing the evidence. *Benitez v. Califano*, 573 F.2d 653, 655 (9th Cir. 1978) (quoting *Flake v. Gardner*, 399 F.2d 532, 540 (9th Cir. 1978)). In reviewing the record, the Court must consider "both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996) (citing *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985)).

Although the Court may "review only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which [the ALJ] did not rely," *Garrison*, 759 F.3d at 1010, "harmless error analysis applies in the social security context."

16

*Marsh v. Colvin*, 792 F.3d 1170, 1173 (9th Cir. 2015). "[W]here the circumstances of the case show a substantial likelihood of prejudice, remand is appropriate so that the agency can decide whether re-consideration is necessary. By contrast, where harmlessness is clear and not a borderline question, remand for reconsideration is not appropriate." *McLeod v. Astrue*, 640 F.3d 881, 888 (9th Cir. 2011) (footnotes, citations, and internal quotation marks omitted).

If the Court identifies defects in the administrative proceeding or the ALJ's conclusions, the Court may remand for further proceedings or for a calculation of benefits. *See Garrison*, 759 F.3d at 1019–21.

## B. The ALJ Erred in Failing to Credit Medical Opinions Regarding Badillo's Psychiatric Impairments

Three doctors provided opinions regarding Badillo's mental impairments. Two of the three doctors, Drs. Harris and El Sokkary, opined that Badillo would miss work more than twice per month due to her psychiatric impairments. AR at 450–54, 474, 563–66, 567, 1714–22. The ALJ rejected the opinions from Drs. Harris and El Sokkary, and instead assigned "great weight" to Dr. Lace's opinion. *Id*. at 26–27. For the reasons discussed below, the Court concludes that the ALJ erred in failing to credit opinions from Drs. Harris and El Sokkary.

Dr. Harris is Badillo's treating psychiatrist, and has been treating her since April 2007.[7] *Id*. at 1341–46. Dr. El Sokkary is a psychiatrist hired by Social Security to examine and test Badillo's cognitive and emotional capabilities. *Id*. at 450–54. As treating and examining

---

[7] The record submitted to the ALJ included notes from Badillo's visits to Pathway to Wellness during 2011, 2013, and 2014. AR at 383–96, 424–34, 1315–53, 1713–22. The record did not contain any notes from 2007 through 2010, aside from Badillo's April 25, 2007 intake assessment, *id*. at 1347–53, but it did contain Outpatient Drug Records from Pathways to Wellness bearing Dr. Harris's name during those years. *Id*. at 1341–46. Notes from 2015 were submitted to the Appeals Council and thus are also included in the record. *Id*. at 1888–1916. The Commissioner contends that because these notes were submitted on appeal, they are not relevant to this motion. Comm'r's Mot. at 10 n.4. Ninth Circuit precedent dictates that a district court should, in at least some circumstances, consider materials submitted to the Appeals Council. *See Ramirez v. Shalala*, 8 F.3d 1449, 1451–52 (9th Cir. 1993); *see also Taylor v. Comm'r of Soc. Sec.*, 659 F.3d 1228, 1231–32 (9th Cir. 2011). Nonetheless, the additional materials submitted to the Appeals Council do not alter the outcome that the ALJ erred in discrediting Dr. Harris' opinion. They demonstrate additional instances of fluctuations in Badillo's psychiatric symptoms, providing a stronger basis for Dr. Harris' opinions, but the Court would reach the same conclusion without the evidence from 2015.

physicians, Drs. Harris and El Sokkary's opinions are "entitled to greater weight than that of a non-examining physician." *Garrison*, 759 F.3d at 1012 (citing *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995)). Because Drs. Harris and El Sokkary's opinions are contradicted, the ALJ can reject their opinions "by providing specific and legitimate reasons that are supported by substantial evidence." *Id.* (quoting *Ryan v. Comm'r of Soc. Sec.*, 528 F.36 1194, 1198 (9th Cir. 2008)). To satisfy this "substantial evidence" requirement, the ALJ must set out "a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998). The ALJ errs when "he rejects a medical opinion or assigns it little weight while doing nothing more than ignoring it, asserting without explanation that another medical opinion is more persuasive, or criticizing it with boilerplate language that fails to offer a substantive basis for his conclusions." *Garrison*, 759 F.3d at 1012–13 (citation omitted).

In his decision, the ALJ "decline[s] to place controlling weight" on Dr. Harris' opinion because "neither [his] own clinical notes nor the overall evidence supports [his] opinion[]." AR at 27. According to the ALJ, "[t]he claimant's medical condition has improved with medication and therapy." *Id.* at 27. Furthermore, while the ALJ placed great weight on most of Dr. El Sokkary's opinion, he disregarded the part stating that Badillo would have difficulty keeping a regular schedule, reasoning that "the claimant's symptoms [have] stabilized with treatment . . . ." *Id.* at 26. These reasons for rejecting Drs. Harris and El Sokkary's opinions are not supported by substantial evidence. While the record shows some improvement since 2011,[8] this improvement does not mean that her symptoms have stabilized to the point where she could consistently attend work. A thorough examination of the record reveals fluctuations in Badillo's mood, affect, behavior, and speech, AR at 383–96, 424–34, 1315–53, 1888–1916, lending support to Drs. Harris and El Sokkary's opinions. For example, on June 4, 2013 a Pathway to Wellness provider noted

---

[8] During the first few sessions, Dr. Harris noted that Badillo's memory was "impaired," and that her attention, judgment, and insight were "poor" or "impaired." AR at 1347–52. Since then, Dr. Harris has generally noted that Badillo's memory is intact and her attention, judgment, and insight have been "fair." *Id.* at 383–96, 424–34, 1319–36, 1902–16.

that Badillo was "clinically stable," her mood was "mixed" and her affect "appropriate." *Id.* at

432–33.  However, on June 26, 2013 Dr. Harris noted that Badillo was "tearful" and "angry" and

that her speech was "pressured." *Id.* at 430–31.

The Commissioner addresses these fluctuations by arguing that "[w]hen Plaintiff lost her

medication or experienced stressors such as financial problems or family concerns, providers

documented appropriate responses to such stressors."  Comm'r's Mot at 11 n.9.  However, this

argument does not discredit Drs. Harris and El Sokkary's opinions.  When evaluating reports of

"improvement" "in the context of mental health issues . . . they must . . . be interpreted with an

awareness that improved functioning while being treated and while limiting environmental

stressors does not always mean that a claimant can function effectively in a workplace."

*Garrison*, 759 F.3d at 1017; *see Ryan*, 528 F.3d at 1200–01 ("Nor are the references in [a

doctor's] notes that [a claimant's] anxiety and depression were 'improving' sufficient to

undermine the repeated diagnosis of those conditions."); *see also Hutsell v. Massanari*, 259 F.3d

707, 712 (8th Cir. 2001) ("We also believe that the Commissioner erroneously relied too heavily

on indications in the medical record that [the claimant] was 'doing well,' because doing well for

the purposes of a treatment program has no necessary relation to a claimant's ability to work or to

her work-related functional capacity.")  Here, the fact that Badillo's condition deteriorated in

response to external stressors suggests that the added stress of a regular work schedule might also

cause increased symptoms.  Regardless, Badillo's significant increase in symptoms in response to

occasional difficulties in her personal life supports the conclusion that she would occasionally

miss work as a result of those symptoms.  Badillo's treating and examining psychiatrists both

agreed that she would be unable to maintain a regular work schedule.  The ALJ is not free to

conclude, without substantial evidence and in contrast to the opinions of treating and examining

physicians, that because treatment has helped Badillo maintain periods of stability she would be

able to function consistently under the added stresses of employment.

Moreover, the ALJ rejected Dr. Harris' opinion because he claims it was "based largely on

the claimant's subjective complaints," which he found to not be fully credible.  AR at 27.  It is

unnecessary for the Court to determine whether the ALJ properly discredited Badillo's testimony

because the record reveals that Dr. Harris' opinion is based on his own observations and those of other members of his treatment team. While visit notes include comments about Badillo's complaints, the form Dr. Harris and other Pathway to Wellness providers use includes a place for written provider impressions and a place to check boxes that describe their observations of Badillo's mood, speech, behavior, etc. By examining only these sections of the record, it is clear that Badillo's symptoms fluctuate over time. While providers note that Badillo's behavior is generally "calm," at times she is "tense" or "agitated." AR at 383–96, 424–34, 1315–53, 1888–1916. Her mood ranges from "mixed" to "anxious," "angry," "sad" and "hypo manic." *Id.* Providers observe that Badillo's affect can be "appropriate," but it is often "tearful," "anxious," or "labile." *Id.* Such observations correspond to notes by medical providers that Badillo's symptoms caused impairment and that her treatment was ineffective. *E.g.*, *id.* at 389–90 (notes from a 2011 visit indicating that Badillo's mood and affect were "sad," "anxious," "irritable," and "angry"; her behavior was "agitated"; her speech was "pressured"; her though process was "circumstantial"; her memory, attention, judgment, and insight were "impaired"; the response of her symptoms to medication was "inadequate"; and her prognosis was "guarded"). These observations are consistent with Badillo's diagnosis of bipolar disorder, and they support Drs. Harris and El Sokkary's opinion that Badillo would be unable to attend work regularly. Thus, the ALJ has not supported his reasons for rejecting examining and treating physician opinions with substantial evidence.

The ALJ assigned "great weight" to the opinion of nonexamining psychiatrist Dr. Lace. "The weight afforded a non-examining physician's testimony depends 'on the degree to which [he] provide[s] supporting explanations for [his] opinions.'" *Ryan*, 528 F.3d at 1198 (quoting 20 C.F.R. § 404.1527(d)(3)). Dr. Lace opined that there is "little evidence from treatment records to suggest [the] assertion" that Badillo's "condition is severe and precludes working." *Id.* As explained above, the record in fact supports Drs. Harris and El Sokkary's opinions. Furthermore, Dr. Lace supports his assertion with the results of Badillo's cognitive testing, which determined that she had a "high level" of cognitive functioning. AR at 1703. It is unclear how a high level of cognitive functioning is inconsistent with missing work several days per month. Simply pointing

to one data point in the record is not enough to discredit opinions from treating and examining physicians that are supported by the record. *See Ryan*, 528 F.3d at 1201 (holding that the opinions of two nonexamining physicians did not outweigh an examining opinion where the nonexamining physicians provided only a bare conclusion with no explanation). For his opinion to be credited over the others, Dr. Lace needed to explain why the other opinions were not supported, and why high cognitive functioning means Badillo would not miss work.

The ALJ erred in failing to credit Dr. Harris' opinion because it was supported by his clinical notes and did not solely rely on Badillo's complaints. The ALJ also erred in failing to credit Dr. El Sokkary's opinion because it was also supported by the record. Slight improvements and stabilization of symptoms do not indicate a claimant will be able to attend work regularly, especially when the record shows that external stressors exacerbate those symptoms. Dr. Lace's opinion to the contrary, lacking meaningful explanation of how he reached his conclusion, is not a sufficient basis to discredit the opinions of the treating and examining doctors. Thus, the ALJ erred in disregarding opinions of Drs. Harris and El Sokkary that Badillo would miss work more than twice per month.[9]

## C. The Appropriate Remedy is Remand for Award of Benefits

Once a district court has determined that an ALJ has erred, the court must decide whether to remand for further proceedings or to remand for immediate award of benefits. *Harman v. Apfel*, 211 F.3d 1172, 1177–78 (9th Cir. 2000). Under this Circuit's "credit as true" rule, a court must credit as true evidence that was rejected and remand for an immediate award of benefits if "(1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were

---

[9] The ALJ assigned "great weight" to the opinion of nonexamining physician Dr. Lynne Jahnke. AR at 26. While Dr. Jahnke opined that Badillo "might miss several days per month due to her abdominal problems," she also found that "[p]sychiatric disease is her primary problem." *Id*. at 1697. This opinion highlights the severity of Badillo's mental health issues. Although Dr. Jahnke is not a psychiatrist, it is illuminating that these issues were so apparent to her that she noted them in her opinion.

such evidence credited." *Harman*, 211 F.3d at 1178 (quoting *Smolen,* 80 F.3d at 1292). A court may remand for further proceedings when "the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled within the meaning of the Social Security Act," *Garrison*, 759 F.3d at 1021, or where "there is a need to resolve conflicts and ambiguities," *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1101 (9th Cir. 2014). A court may also remand for the limited purpose of determining when a claimant's disability began if that date is not clear from the credited-as-true opinion. *See Dominguez v. Colvin*, 808 F.3d 403, 409 (9th Cir. 2015). Outside of those circumstances, remand for further proceedings is an abuse of discretion if the credit-as-true rule establishes that a claimant is disabled. *Garrison*, 759 F.3d at 1020.

Here, the credit as true rule reveals that Badillo should be awarded benefits. As explained above, the ALJ failed to provide legally sufficient reasons for rejecting Drs. Harris and El Sokkary's opinions that Badillo would not be able to consistently attend work. Their opinions, therefore, must be credited as true under the Ninth Circuit's rule. Furthermore, there are no outstanding issues to be resolved, and the record makes it clear that the ALJ is required to find Badillo disabled after crediting these opinions. VE Van Winkle testified that there would be no jobs available in the economy for a hypothetical claimant with Badillo's age, education, previous work experience, and mental limitations if that person could not maintain a consistent, eight hour workday, forty hour work week and had to miss work two or three times per month. AR at 63–65. In addition, nothing in the record casts serious doubt on Badillo's disability, indicating that remanding for further proceedings is unnecessary and would be an abuse of discretion. Thus, an award of benefits is appropriate.

### D. The Court Need Not Reach Arguments Regarding Badillo's Physical Impairments

Badillo also contends that the ALJ erred by rejecting opinions regarding her physical impairments, omitting a severe physical limitation from the ALJ's RFC assessment, and relying on incomplete vocational expert testimony. Pl's. Mot. at 6–8, 14–18. Because the Court finds that the appropriate remedy is to remand for an award of benefits based on the ALJ's errors regarding Badillo's psychiatric impairments, the Court declines to reach the issues regarding Badillo's

physical impairments.

## IV. CONCLUSION

For the reasons discussed above, Badillo's motion is GRANTED, the Commissioner's motion is DENIED, and the matter is REMANDED with instructions to award benefits. The Clerk is instructed to enter judgment in favor of Badillo and close the file.

**IT IS SO ORDERED.**

Dated: July 27, 2018

JOSEPH C. SPERO
Chief Magistrate Judge